The next case on the calendar is NDC Construction Company v. Secretary of Labor. Good morning, counsel. Are you prepared to proceed? Good morning, your honors. May it please the court. My name is Anthony Tilton. I'm here on behalf of the petitioner, NDC Construction Company. This morning, your honors, NDC is asking the court to reverse the ALJ's decision and vacate OSHA's citation and notification of penalty for three reasons. First, your honors, the ALJ's decision impermissibly relies upon OSHA's 1999 multi-employer citation policy as dispositive law in the ALJ's opinion. The second issue, your honors, is that even if the ALJ were permitted to rely on OSHA's interpretive enforcement policy, the standard within the policy is at odds with commission case law on what is and what is not reasonable diligence. And then finally, your honors, the ALJ's decision is not supported by substantial evidence. So to my first point, your honors, and I think this is very important, NDC Construction is not advocating that OSHA is not allowed to have an interpretive internal enforcement policy. Agencies are certainly at liberty to draft internal instructional guidance documents to aid their officers and investigations and to govern their agents and their employees. The issue is that when that multi-employer citation policy is used like it was in this case as dispositive law to determine whether or not a prime contractor on a multi-employer work site was in fact reasonably diligent in that prime contractor's duties, that's the issue. And when the multi-employer citation policy is used the way that it was in this matter, it amounts to an unpromulgated rule. It carried with it the force of law. And judges, if they're going to, if the ALJs, if OSHA, if the Department of Labor is going to use the multi-employer citation policy and they want it to be a law, it's our position that they ought to make a rule. They ought to go through the rulemaking notice and comment period that is provided to the Department of Labor to bring forth industry experts from all over the country, general contractors from all over the country, as well as safety and health representatives to get together. It's a fascinating idea that the agency keeps to make a great rule that general contractors and prime contractors on multi-employer sites can then know how to comply with. This internal enforcement policy, which is vague, ambiguous, and to this day, since 1999, we're still uncertain of its limits or what responsibilities it actually places on general contractors or prime contractors on multi-employer sites, if OSHA would do what it has done before, Your Honors, and that is promulgate a rule. And I actually, it was brought up in my reply brief. On this argument, I have a question on this argument. So on this argument, I read the ACOSTA decision from the Fifth Circuit, the new Fifth Circuit. Would you agree that if we were to follow the ACOSTA decision when looking at our previous precedents of the multi-employer policy, that we would reject your argument? Are you asking us to distinguish that precedent? Are you asking us to just disagree with the Fifth Circuit? What's your Yes, Your Honor, I'm asking you to distinguish that precedent. And so what's really important is there's a couple of things going on here. The multi-employer doctrine is a product of 46 years of case law. I think it came about in Anning-Johnson, the commission, and many of the circuits have now accepted this doctrine, which is there is a series of facts where a general contractor or a facility owner could be liable for the bad acts of a sub, the violations of a sub. We're not advocating against that, judges. And that, the Fifth, for the longest time, said no. The act has interpreted employee as employee, employer as employer. What we're saying is we certainly believe that there may be instances, in fact, that Hensel Phelps case, Your Honor, it was the controlling contractor, the employer, actually ordered the employees into a ditch with uncapped rebar and all. That's a scenario which is very different here. So we are asking you to distinguish between the doctrine, which is yes, there may be a time that a general contractor is liable for the bad acts of the subs, and the policy, which is an internal enforcement guideline drafted by the Secretary of Labor to govern its compliance officers, which was then used with the force of law here by the ALJ. The ALJ outlined his argument as to whether or not NDC construction was controlling, and most importantly, as to whether or not NDC construction was reasonably diligent. And he didn't rely on commission precedent. He relied on an internal enforcement policy. And that amounts to the unpromulgated issue. So I'm glad you asked that, Judge. So just to play that out, just so I can be clear. So you're saying that the doctrine exists, or you're, you know, for purposes of this argument, we can assume the doctrine exists. And the problem is not that the ALJ relied on the doctrine. It's that the ALJ relied on the memo, or whatever, the piece of paper from the agency, in lieu of relying on the doctrine. Precisely, Your Honor. And I'm going to start calling it a memo from here on out. That's exactly what the ALJ did, is relied on a memorandum, which tell, and it's very important what the memorandum is, what the policy is. It tells compliance, safety, and health officers when and how to cite general contractors. It provides all sorts of great hypotheticals for the officers as to how to go about finding someone who is liable and not behaving. But nowhere within that policy does it tell general contractors or facility owners in this country as to how to comply. And that was something that came up on numerous occasions at trial. And it's actually a product of a lot of OSHRC case law, is that the Secretary of Labor has to tell us how to comply. And I asked the Assistant Area Director. I asked the compliance officer. NDC Construction is doing site audits. They're facilitating site safety walks. NDC Construction is demanding toolbox talks from its subs. NDC Construction is demanding that the subs give a safety manual at the onset of work. And when I said, what else is needed, if I recall correctly, that's up for them to decide, but it's more. And that's unacceptable, Your Honor. One of the crux of this issue is, and the reason that we're here, is we want to be able to tell after 46 years of multi-employer fights within the circuit courts, we want to be able to tell facility owners, factories, and general contractors, this is what you have to do, and this is what you can't do. And OSHA's done that before, Your Honors. And it's in reply when we talk about steel erection, hazardous waste operations, confined spaces, and asbestos. OSHA took the time and energy to promulgate a rule to define, there's a definition in the steel erection and in the confined space standards, Your Honor, what is a controlling employer? It's right there in the Code of Federal Regulations. There's no more debate. There's no more internal memorandum. What did they really mean by that? It's right in the Code of Federal Regulations. Okay? I met that definition. I can move to subsection A. A controlling employer has to, and I'm using steel erection for example, a controlling employer has a notification responsibility. It's in the standard. It tells the controlling employer, you have to notify of these types of issues. You have to notify the hazardous waste operations, Your Honor. It even goes so far as to command that controlling employers safety data sheets. Host employers is the word they use there. Provide safety data sheets to subcontractors. We're not saying that OSHA doesn't have that authority. If it keeps folks safe and alive on job sites, we're all for it. What we're asking is, if you're going to make that authority law, please let us know. Please put it in the Code of Federal Regulations, which is a great big giant book in Washington, D.C. somewhere, that will tell us how to comply with the law. I think that's what's at the crux of this issue, Your Honors. Very quickly, moving on to my second point, which was even if that internal memorandum is allowed to stand, and even if the ALJ was allowed to rely on it, the internal policy actually contains different standards that are at contrast with commission precedent. Very briefly, the policy requires a general contractor or a controlling contractor to prevent and detect violations on the work site. That's very, very different than the standard that is provided by the OSHRC decisions, which says that a general contractor or a controlling contractor may prevent or detect an abate. So the prevention of hazards, Your Honor, is, you know, in the instance that a violation does in fact occur, the general contractor is liable by the very fact that it occurred. And that's what the ALJ did. The ALJ applied this policy as law, but in using the policy, it says prevent and detect. So the very existence of the hazard, the very existence of the violation, ended the analysis. The ALJ did not take the time or energy to look into what NDC construction did to detect and abate those violations. And that's what's very, very important coming out of the Sun in 2019, which is not a new idea. That was a product of the Syntex Rooney case from the commission in 1994, which says that a GC, okay, first has to prevent the bad act. But when the bad act occurs, what did they do to fix it? And that's where the ALJ missed the ball. The ALJ, and my time has expired, Your Honors. Thank you all. Thank you. You have five minutes remaining for rebuttal, counsel. Thank you. May it please the court. Good afternoon. My name is Stephanie McInnis, and I represent the United States Secretary of Labor in this case. Your Honors, the central issue in this case is one of reasonableness. First, whether NDC acted reasonably as a controlling employer at a construction site. And if the court reaches this issue, regardless of waiver, whether the secretary's interpretation of the OSH Act is a reasonable one that should be deferred to. Here, the ALJ's decision makes clear that NDC was an employer who controlled a worksite it knew to be unsafe because of dozens, if not hundreds, of fall protection hazards, but failed to take any reasonable steps to make these hazards stop. NDC's superintendent's response at trial reflects how NDC did not take safety seriously. At trial, he explained that he didn't discipline anyone, quote, spanking them, firing them, or otherwise. Now, NDC erroneously presents two arguments not preserved before the commission in an attempt to persuade this court to ignore broad legal consensus and create a circuit split on the issue of OSHA's multi-employer citation policy. We ask this court to affirm the commission's final order, finding NDC in violation of OSHA's fall protection standard. Would you address the circuit split issue, the Acosta case from the Fifth Circuit? The other side of the case argues that we can distinguish that. What do you say about that instead of just disagreeing with it? I honestly am not sure how you would be able to distinguish Acosta from this case. In that case, they found that the secretary had the authority to cite controlling employers, according to the language of 64A2, that understands that there's a difference between keeping employment safe and keeping a place of employment safe. Similarly, in this case, we derive our power, or our authority, from the fact that we have the authority to cite NDC based on the same interpretation of the statutory language. Obviously, when a court looks at a citation, the liability is couched by reasonableness. There are some factors that a court can look to, or that an investigator can look to, when determining whether or not a general contractor or a controlling employer acted reasonably to keep their work site safe. But those are similar facts and similar legal issues that occurred in Acosta. To the extent that the secretary has the authority to cite NDC under its multi-employer policy, we would argue that the two legal issues are identical. You mentioned that the contractor had the power to fire the subcontractor's employee that's violating the law? So, NDC's authority to fire an employee... Let's just be specific about Miller. They met with Miller, and they pointed to two employees who were violating the rule. What power, and from what is it derived, that Miller had to go over there and stop them? The general contractor has a responsibility to keep its work site safe. Their authority comes from that responsibility, as well as, in this case specifically, there were contractual duties... The general contractor's workplace? Correct. You're saying that by contract law, he had the power to go over there and tell the employee to quit working or take some action to stop it? Correct. So, they could have done any number of things. If there was fall protection equipment... My question is, what's the source of the power? The source of the power comes first within the... They have a contract with a subcontractor. Yes, correct. Does that speak to the source? So, the source comes from the contract itself. The contract. So, the safety policies and the contract that they have with the subcontractor, within that they explain that they have the authority to fire subcontracted workers if they violate safety standards. They didn't actually enforce any of this. There are a few cases that talk about whether or not contractual obligations themselves have the ability to impose liability on general contractors. I'll have to look at which case that is in a second. All of this to say, the actual liability placed on the general contractor in this case is coming from statutory language. So, knowing as a general contractor that you have to keep your worksite safe, then you have to take reasonable steps to do so. What is the source for the reasonable step to walk over to the building and remove the employee from the site? It's their worksite, right? So, they hired the subcontractors. It's their worksite, right? So, their power comes from it being their worksite, first and foremost, and second, from the contracts themselves that they have with the subcontractors that say, we approve your work, including your abiding to the safety... The contracts between the contractor and the subs were not in record, as I understand it. Correct, yes, but their safety policy was, right? So, assuming that their safety policy was being, to the extent that it's in the record, they did have the power to, at the safety standards. In this case, the facts of this case are not particularly close, right? Like, they didn't even investigate the workers that were actually violating the safety standards. But Council, isn't one of the issues that, at least what your friend on the other side is saying, is that OSHA didn't tell them what the safety standards are. They're supposed to guess, I guess, what the safety standards are, because OSHA hasn't promulgated a rule or regulations that provide notice to contractors. Yes, I understand that argument, but to the extent of the multi-employer citation policy or, you know, how the Commission has interpreted the multi-employer citation policy, it's certainly not the first legal standard to require reasonableness. Is it your argument that this is a functional equivalent of the rule that was promulgated and subject to APA review? I'm sorry, I don't understand the question. Is it your position that this policy is the functional equivalent of a rule that has the same standing as a rule that's promulgated, pursuant to the power granted as Secretary under the statute? So, the Secretary's position is that, to the extent that the multi-employer citation... The Secretary has the power to promulgate rules. Yes. Pursuant to the rule-making power. Yes. The rule in this case that governs height was promulgated that way. Correct. Okay. Is it your argument that the policy that was implemented in this case is entitled to the same deference, let's put it this way, as a rule that's promulgated? No, Your Honor. Our argument specifically is that... You concede then that the policy can't be a rule in that sense? Correct. So, the policy is not a rule, right? That it didn't go through APA's notice and comment. It didn't go through rule-making. Correct. Yeah, it's not a rule. It's an enforcement policy that's based on... It's established by adjudications. So, no. It's established case by case. Yeah. So, the issue of controlling employer, to the extent that it is specific to controlling employers was an interpretation of 654A2, that specific section of the OSH Act. The Secretary's position is different than OSHRC, the commission, and at points we conflicted with each other. If you look at the history of the controlling employer doctrine, it's specifically the Secretary's interpretation, and they talk about this a little bit in Summit Contractors in the D.C. Circuit. It's particularly the Secretary's interpretation of the language of the OSH Act that is entitled to this Chevron deference. To the extent that courts have used factors, factual considerations, to determine what is reasonable in imposing obligation on controlling employers, that's a substantial evidence issue. Of course, there are factual issues that go into play as to whether or not a controlling employer exercises reasonableness. But again, in this case, we have all sorts of factors that contribute to the substantial evidence. As early as November 2016, four months before the date of the inspection, they knew these subcontracted workers were violating safety standards, and these supervisors were out on site. They admit that they saw fall protection violations multiple times a week. If a general contractor knows that there are these rampant safety violations occurring on a frequent basis, and it told its subcontractors about them on week one, and at week one it didn't work to abate the safety violations, it's certainly not going to work at month four. And this is obviously a pervasive problem on this work site, because on the date of the inspection, the investigator saw nine different safety violations on site, including one that was actively occurring, and that the supervisor did nothing to stop. Moving on, NDC waived its two other arguments not relevant or not particular to reasonable diligence, and this court should decline to rule on them. The Osh Act, section 660A, explains the party is jurisdictionally barred from arguing a position it did not alert the commission to in its petition for discretionary review. This principle is also supported by the D.C. Circuit in Frank Lillen's son, the First Circuit in P.G. Oso and Sons, the Fifth Circuit in Power Plant Division, and many other courts. In the Secretary's understanding, the thrust of NDC's argument before this court is that pre-Chevron precedent and general principles of administrative law prevent this court from affirming the citation under the OSHA's multi-employer citation policy, but NDC did not argue this at the trial level, and additionally, its petition for discretionary review never alerted the commission to these issues. Now, NDC in its argument claims that its vague reference in its petition that the ALJ, quote, misapplied the law is sufficient to overcome waiver, but it is not. The commission could not have reasonably understood NDC's argument in its petition for discretionary review to encompass the specificity of the arguments that it brings before this court. Because the commission was never given an opportunity to rule on these issues, their arguments are waived before this court, and it's jurisdictionally barred. Regardless of waiver, OSHA's multi-employer citation policy is a reasonable interpretation of the OSHAC's language, purpose, and regulations. On page 13 of its reply brief, NDC confusingly states that it is not challenging the Secretary's subcontractors. It admits it's a controlling employer, and it admits that its subcontractors violated safety standards. So it seems NDC's only qualm is that when investigators are determining whether to cite a controlling employer, or when courts are determining whether or not a controlling employer is liable, they aren't allowed to look to the Secretary to any guidance or any guideposts or any factual examples that, in OSHA's understanding, are factors that courts should look to when determining reasonableness. Respectfully, this is nonsensical. OSHA has the specific expertise to understand that there are many different factors that play into whether or not a general contractor is liable for not keeping its worksite safe. OSHA doesn't pretend to understand all of the different factual circumstances that could be present in the case. It doesn't pretend to understand all of the different things that a controlling employer can do to keep its worksite safe. But what's clear in this case is that NDC did not do any of those things. It didn't investigate who was violating safety standards. All it did was send letters to its subcontractors, and NDC supervisors even admitted that they would, quote, be lying if they said that they actually followed up to see whether or not these safety violations were abated after they called the subcontractor supervisors. So it's clear that when the ALJ was examining this case and determining whether or not liability in this case would be reasonable, their finding was supported by substantial evidence that in all four cited citations, there was constructive knowledge because these fall protection violations were open and obvious. Thank you. Thank you very much for your argument, counsel. Thank you. Mr. Chilton, you have five minutes remaining for rebuttal. Thank you, Your Honors. First, the issue of reasonable diligence. Your Honors, I'm not sure where in the record there were hundreds of fall protection violations. I'm not sure if anybody ever said that it was rampant. But here's what I would like to cite to in the record, and I think this is very telling, as of the reasonable diligence that NDC Construction practiced on the work site. And it's in the transcript. It began on page 680. It went on to page 894. And it's also some of the meeting minutes that were produced as Exhibit W. And that is that this project took 14 months. It was 20 acres of construction. It was 48 subcontractors, 172 laborers at peak times of construction, 172 individuals who did not work for NDC Construction, 252 elevated balconies on three-story multifamily housing. There was no injury and there was no illness whatsoever during that time. There was one incident, and we know this because NDC took the time and energy and practiced the due diligence to find out when a near miss occurred. It was a slipped ladder. It was a near miss, and it's actually discussed at great length in that Exhibit W, which is one of many examples of how safety issues were brought up at weekly meetings. So those are the facts. The issue about the rampant or decayed safety practices at the site is entirely unfounded. We've got 14 months of construction without injury or illness. When we talk about staying with reasonable diligence, when we talk about this idea of what did NDC Construction do, NDC Construction, when they detected violations, they were abated. So speaking specifically to the Compliance, Safety, and Health Officers allegations the day of the investigation, the Compliance, Safety, and Health Officer did testify that when he walked out of the trailer, folks were still working, and there were no violations when he walked out of the trailer. Anything that he had seen previously was corrected. A lot of discussion about Mr. Jim Miller, but one thing that was omitted is that Mr. Jim Miller testified that as soon as he was able to get the officer to head to the trailer, Mr. Jim Miller notified and ensured abatement. He got on the phone with the sheetrock contractor, the framer, and I think the sheathing contractor, Your Honor, but please don't quote me on that. And the issues were corrected. When Kosho Ortiz walked out of that trailer, this incredible decadence that, you know— But your argument, you're now treating the policy that you mentioned in your opening argument as a negligence standard, basically. If you shrink it down, it's a negligence standard. What would a—that's your argument? Just a minute. What would a reasonable controlling contractor with a lot of subs, what would it do under the circumstances? Yes, Your Honor. Given the regulations having to do with heights. Yes, Your Honor, and I think even more telling is what— No, I say—I hear your argument now as being the contractor was not negligent under the circumstances. No, Your Honor. Let me see if I can clarify it. The contractor met or exceeded the commission precedent, which is commission precedent says to prevent or detect an abate, and there's specific examples that I— I understand. But your argument is that basically they have that duty and they can be negligent in discharging it. They have a duty and we've yet to be told what it is, I think is paramount. Well, that's another argument. The duty's not—they're not told what it is. Your Honor, do you mean discharge it to the subcontractor? Is that it? No, what I'm just saying that I hear your argument is kind of a jury argument on the facts. Understood, Your Honor. Under a negligence standard. So— If you shrink it all down to a negligence standard. And I think that the—you know, back to the law, the issue is whether or not NDC construction practiced the reasonable diligence that's required of a controlling contractor in a similarly situated manner. Well, that's a negligence standard. Okay, and that's—and I think, Your Honor, maybe the confusion is we still don't know. We still don't— You're accepting the policy and making an argument that they weren't negligent. They were not, Your Honor, and the policy is not law. I understand you have another argument that the policy is not law. Yes, Your Honor. Okay. Can I ask you, before you sit down, can I ask you to address the waiver point? Because I looked at the petition that you filed and there are five sort of— the way I saw it, there were five objections in that petition and I'm just wondering which one of those you would view as covering the broader argument that you're making. Yes, Your Honor. So, thank you. And my time has expired, so I'm going to try to be as brief as I can. Please, you can answer Judge Brasher's question, please. Thank you. Thank you, Your Honor. So, when we filed our petition for discretionary review, it's actually governed by a very specific OSHRC rule, 2200.91, which demands brevity, something I've never been great at, and it demands that legal memorandum, legal argument, references to other pleadings is actually explicitly prohibited. There is a case that says great specificity is not required in a petition for discretionary review. And so, Your Honor, Judge Brasher, we actually—I'm going to point just to number one. And in number one, NDC takes exception to a portion of the decision as contained at 45 through 52. Judge, that's one example of where the—if I can find the decision. It's one example of where the ALJ made his argument using the multi-employer citation policy and treating it as law, as the standard for what is or what is not reasonable diligence. And I actually called it impermissibly expansive. And I'm trying to find exactly—Your Honor, I think that's it. It's that first—it's contained within the decision as to the standard of what is or what is not reasonable diligence of a GC. The ALJ standard was using a policy, which is not rule or law, versus—which is inconsistent with commission standards. Thank you. Thank you very much for your time, Your Honors. Thank you very much to both of you.